IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

**FILED**

1:49 pm, 8/12/20

**U.S. Magistrate Judge**

PETER D. HOLDINGS LLC, *assignee of Black Diamond Energy, Inc., and assignee of Black Diamond Energy of Delaware, Inc.*,

        Plaintiff,

    vs.

WOLD OIL PROPERTIES, LLC, *a Wyoming limited liability corporation*, and CHIPCORE LLC, *a Wyoming limited liability corporation*,

        Defendants.

Case No.  17-CV-212-R

---

## ORDER ON BENCH TRIAL

      This matter is before the Court following a four-day bench trial. The parties have fully briefed the issues and presented thorough proposed findings of fact and conclusions of law. Having carefully reviewed the evidence presented and the arguments and proposals of counsel, the Court finds judgment in favor of Defendants is proper as to all claims.

## BACKGROUND

      This case involves six contractual arrangements executed among seven entities over the course of seventeen years. As such, a linear factual narrative would appear desultory. Rather than plunging into its findings of fact, the Court first offers a contextual narrative because it is only with this contextual primer that the findings of fact become comprehensible.[1]

---

[1] This section does not constitute the Court's formal findings of fact as required under Rule 52 of the Federal Rules of Civil Procedure. To the extent any facts stated in this section are material to the ultimate conclusion in this case, proper citation to the record is given in the formal Findings of Fact section.

In the late 1990s, Erik Koval was working for a Pennsylvania-based oil and gas production company that primarily operated in the Appalachian Basin. Koval staunchly advocated to move some of the company's operations to the Rocky Mountain Region because of the coalbed methane gas (CBM) boom. When the company dispelled of Koval's idea, he set out to form his own company—Black Diamond Energy, Inc. (BDE)—to do just that.

BDE formally became a Wyoming corporation in 2000 with the stated purpose of exploring CBM in the Powder River Basin, an area that encompasses parts of southern Montana and northern Wyoming. To raise capital for the venture, Koval sold limited partnership interests to BDE's investors, which included himself, Joe Breznai, Steve Onufrak, and Pete Burns.

Around the same time, Wold Oil Properties was the lessee of and cotenant on certain oil and gas interests in the Powder River Basin. Wold wished to explore these interests to determine whether CBM was present in commercially productive quantities. In September 2003, BDE (as farmee) and Wold (as farmor) entered into a Farmout Agreement for BDE to explore some of Wold's interests in what became known as the "Contract Area."

The Farmout had two components. First, BDE would purchase 25% of Wold's interest in the Contract Area. Second, BDE had the option to earn additional interests in the Contract Area upon satisfying a number of conditions. Specifically, BDE had to drill and complete ten wells within a specified timeframe to earn 25% of Wold's interest in the area surrounding the wells. BDE also had to expend a certain amount of money as a form of a drilling commitment to ultimately earn 25% of Wold's interest in the entire Contract Area. BDE became the designated Operator of Record for the Contract Area, which rendered it the responsible entity for the exploration, drilling, and operation of the subject wells and leases. The parties disagree

2

as to when the Farmout Agreement terminated and the reasons for its termination, but suffice it to say that Wold never assigned any additional interests to BDE. Nevertheless, BDE continued to drill, explore, and operate in the Contract Area. The Contract Area was eventually divided into two separate plans of development (PODs), known as POD I and POD II.

In 2007, Koval formed Black Diamond Energy of Delaware (BDED). Similar to BDE, BDED served as an oil and gas exploration company that conducted some operations in Wyoming. The precise relationship between BDE and BDED is disputed, but it is undisputed that BDE and BDED were often referred to interchangeably in subsequent documents and contractual agreements.

In October 2008, Wold and BDE entered into another contractual agreement—the Letter Agreement—which delineated the parties' respective financial obligations with respect to drilling and development in POD I. The parties dispute what effect the Letter Agreement had on the Farmout's drilling commitment.

In the fall of 2008, the parties executed a Joint Operating Agreement (JOA) with Wold as a non-operator and BDE as Operator. BDE had entered into JOAs with all other interest owners in the Contract Area well before it executed this JOA, despite its retroactive effective date of August 1, 2007. The JOA provided that, as Operator, BDE was responsible for paying all contractors, suppliers, wages, and salaries for services rendered in the course of drilling. To the extent BDE was entitled to reimbursement by non-operators, BDE was required to send joint interest billing statements (JIBs) demonstrating the non-operator's proportionate share of expenses.

Around February 2009, various service providers filed multiple liens against the wells in POD I as a result of BDE failing to pay the expense accounts. BDE resigned as Operator of

Record effective March 1, 2009, and Wold became the successor-Operator.  In June 2009, BDE delivered approximately $575,000 of equipment and inventory to the Contract Area.

By this time, BDE and its many affiliate companies (collectively "BDE Entities") held mineral interests in 118,500 gross acres of land in the Powder River Basin.[2] To raise operational capital for these ventures, some of the BDE Entities obtained roughly $32 million in loans from S&T Bank, which were all secured by leasehold mortgages and security interests in most of BDE's and BDED's assets.

Toward the end of 2009, BDE was failing to pay its JIBs and discharge its financial obligations arising under the JOA. Accordingly, Wold sent BDE a Notice of Default in December 2009. When BDE failed to cure its default, Wold applied a 300% penalty to its proportionate share of expenses as permitted under the JOA.

In January 2011, S&T Bank agreed to assign the remaining BDE Entity loans to Mitchell Resources LLC for $1 million. Mitchell Resources then agreed to assign the loan obligations to BDE and BDED in exchange for their provision of the $1 million, in addition to Mitchell Resources receiving $65,000 cash, certain leasehold rights in the Powder River Basin, and an option to purchase additional mineral rights in the area. The Powder River Basin leasehold rights under this agreement included BDE's interests in POD I. In March 2011, BDE and BDED transferred the $1 million to S&T Bank, and S&T Bank transferred all of the BDE Entity loan instruments to Mitchell Resources. Around this same time, Wold received a Notice

---

[2] In addition to BDE and BDED, the "BDE Entities" consisted of the following entities: Koval Resources LLC, Valhalla Energy Inc., Valhalla Water Services LLC, Valhalla Aviation LLC, Valhalla Drilling LLC, Valhalla Gathering & Transmission, Koval Energy LLC, Black Diamond Energy Partners (BDEP) 2001-A Ltd., BDEP 2001-B Ltd., BDEP 2002-A Ltd., BDEP 2002-B Ltd., BDEP 2003-A Ltd., BDEP 2004-A Ltd., BDEP 2004-B Ltd, BDEP 2005-A Ltd., BDEP 2005-B Ltd., BDEP 2006-A Ltd., BDEP 2006-B Ltd., BDEP 2007-A Ltd., BDEP 2007-B Ltd., BDEP 2008-A Ltd., and BDEP 2008-B Ltd. [Defs.' Ex. I, at 2 n.1].

of Intent to Foreclose the BDE Mortgage from Mitchell Resources. In lieu of foreclosure, Peter Dochinez, the sole member of Peter D. Holdings, agreed to accept the deed to the POD I field office as well as other BDE- and BDED-owned properties. [Vol. II, at 255 (Koval)]. BDE and BDED also arranged for Dochinez to receive the assignment of the S&T loans from Mitchell Resources. The remainder of the S&T-Mitchell Resources agreement purportedly broke down prior to final execution, which led to BDE, BDED, and Dochinez filing suit in Pennsylvania state court for breach of contract damages and specific performance in June 2011.

The parties eventually reached a settlement agreement whereby Peter D. Holdings acquired the loan instruments in March 2014. In June 2014, BDE executed and duly recorded an assignment of its interests in the Contract Area to Peter D. Holdings. Dochinez has since ordered Koval to recoup the money and security interests owed to him, which Koval has agreed to do in an apparent attempt to reduce the $32 million debt he personally owes Dochinez.

In February 2015, BDED and Peter D. Holdings, as BDE's assignee, filed suit against Wold and Chipcore, the current Operator of Record for POD I, in Wyoming state court. BDED and Peter D. Holdings asserted claims for an accounting, unjust enrichment, and conversion with respect to the inventory and equipment it delivered to the Contract Area in 2009. Importantly, however, BDED and Peter D. Holdings specifically and intentionally limited the 2015 state court action to the wells and leases in POD II.

In December 2017, Peter D. Holdings, as BDE's and BDED's assignee, filed suit against Wold and Chipcore in this Court, specifically in relation to the wells and leases in POD I. In its original Complaint, Plaintiff asserted claims for rescission, unjust enrichment, breach of contract, tortious interference, specific performance, and an accounting. It was not until

Plaintiff filed its Second Amended Complaint in May 2019 that it alleged a claim for conversion of the inventory and equipment delivered to the Contract Area in 2009.

## THE PARTIES' CONTENTIONS

Plaintiff's primary cause of action is breach of contract. Plaintiff asserts Wold breached the Farmout Agreement by (1) failing to convey an interest it owned as of the date of execution; (2) improperly limiting the purchased assignment by depth; (3) failing to assign a 25% interest surrounding the Initial and Additional Wells; (4) failing to assign a 25% interest in the entire Contract Area; and (5) failing to enter into a JOA governing BDE's continued operations in the Contract Area.  To remedy Wold's breaches of the Farmout Agreement, Plaintiff seeks specific performance compelling conveyance of the additional 25% interests.[3] Alternatively, Plaintiff requests rescission of the Farmout and Letter Agreements on the basis that Wold never intended to comply with the terms of the agreements, and seeks damages equal to the money expended in developing the wells in POD I.

Defendants maintain this claim is barred by the applicable statute of limitations. Alternatively, Defendants argue BDE failed to earn the assignments and therefore it is not in breach for failing to convey them. Even if Wold breached the Farmout, specific performance is improper because Plaintiff failed to demonstrate monetary damages are inadequate. Moreover, Plaintiff is not entitled to a rescission because it failed to establish Wold fraudulently induced BDE to execute the Agreement and Plaintiff failed to timely exercise its right to rescission.

---

[3] Plaintiff's Second Amended Complaint plead rescission of the Farmout Agreement as an alternative remedy to specific performance. This cause of action was briefed on summary judgment, but Plaintiff failed to offer proposed findings of fact and conclusions of law or post-trial argument on the issue.

As to the Letter Agreement, Plaintiff argues Wold was in breach by failing to pay its fair share of expenses for the drilling and development of wells in POD I and by wrongfully refusing to timely execute a JOA. To remedy Wold's breach of the Letter Agreement, Plaintiff seeks $1,719,483.37 in damages, which amounts to $3,619,257.37 with interest. Alternatively, Plaintiff argues—for the first time in its post-trial brief—that BDE is entitled to reimbursement of this amount to avoid unjust enrichment. Defendants argue BDE breached the Letter Agreement, not Wold. Even if Plaintiff is entitled to any sort of monetary damages, Plaintiff failed to prove its damages with a reasonable degree of certainty.

Plaintiff also seeks to recover on a claim of conversion on the basis that Wold wrongfully converted the equipment left in the Contract Area. Plaintiff requests the value of the equipment, which is $575,004.02. Defendants argue Plaintiff's conversion claim is barred by the statute of limitations, and that it fails because Plaintiff failed to demonstrate it has legal title to the equipment.

As an equitable remedy, Plaintiff seeks an accounting for the revenue and expenses of the POD I wells on the basis that Defendants have wrongfully failed to pay BDE, BDED, or Peter D. Holdings any amounts for the wells since they began producing in 2009. According to Defendants, Plaintiff is not entitled to an accounting because it failed to comply with the requirements under the JOA.

Defendants also argue Plaintiff is not the real-party-in-interest because BDE never assigned the rights and interests arising under the Agreements to BDE or Peter D. Holdings. Plaintiff asserts there was a de facto consolidation of BDE and BDED in 2007 and that, for all intents and purposes, they were the same company.

## STANDARD ON BENCH TRIAL

When a matter proceeds to a bench trial, the trial court sits as the finder-of-fact. *Soto v. Jurado*, 166 F.3d 1222, 1998 WL 911693, at *2 (10th Cir. 1998) (table); *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019). In its capacity as trier-of-fact, the trial court must determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has satisfactorily proven its case. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 215 (2d Cir. 2001). When material evidentiary conflicts arise, the trial court must resolve such conflicts by considering the respective interests of the parties, the demeanor of witnesses, and the extent to which testimony is corroborated. 89 C.J.S. Trial § 1212 (June 2020 update).

Following a bench trial, the Court must separately issue findings of fact and conclusions of law. FED. R. CIV. P. 52(a). The Court may do so orally at the conclusion of evidence or in a subsequent opinion or memorandum of decision. *Id.* In either instance, the Court's findings of fact should be sufficient to indicate the factual basis for its conclusion, indicate the legal standards against which the evidence was measured, and be broad enough to cover all material issues. *Otero v. Mesa Cnty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977). General, conclusory, and inexact findings are insufficient. *Battle v. Anderson*, 788 F.2d 1421, 1425 (10th Cir. 1986). At the same time, however, overelaboration of detail or particularization of facts is unnecessary. FED. R. CIV. P. 52 (advisory committee notes the 1945 amendment) (internal citations omitted); *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 877 (10th Cir. 1984) (warning against "inordinately detailed findings"). The proper balance will assist the trial court in thoroughly adjudicating the facts and provide the appellate court with a clear

understanding of the basis for the trial court's decision. *Colo. Flying Acad., Inc. v.*, 724 F.2d at 877.

## THE PARTIES' PROPOSED FINDINGS OF FACT

It is entirely within the Court's discretion to request the parties submit proposed findings of fact and conclusions of law. *Nyyssonen v. Bendix Corp.*, 342 F.2d 531, 532–33 (1st Cir. 1965). Trial courts often do so in highly technical or complicated cases. *Id.* The Court exercised its discretion to do so in this case, and the parties each submitted extensive proposed findings of fact and conclusions of law. [*See* ECF Nos. 104, 106, 107].

Plaintiff maintains Defendants' proposed findings of fact run afoul of the Court's Order delineating the proper form of submissions and the timing of the submissions was patently unfair. [ECF No. 107, at 2–3].[4] As such, Plaintiff requests leave to submit similarly-formed findings of fact and argues the Court should deem Plaintiff's findings of fact admitted or strike Defendants' non-compliant findings. [*Id.* at 3]. For the following reasons, the Court declines to do so.[5]

---

[4] The Final Pretrial Order detailed how each proposal should be formatted, and the timing was agreed to after the close of evidence at trial. [ECF No. 93, at 22–23; Vol. IV, 811–812]; *see* U.S.D.C.L.R. 52.(1).

[5] Plaintiff complains that Defendants' proposed findings include improper citation to the transcript and evidentiary record in contravention of the letter and spirit of the Court's Final Pretrial Order, which offered guidance as to the form and substance of their proposed findings. [ECF No. 93, at 22–23]. To be clear, the Final Pretrial Order "is not a frivolous piece of paper, idly entered, which can be disregarded by counsel without peril." *Johnson v. Mammoth Recreations*, 975 F.2d 604, 610 (9th Cir. 1992). But to the extent Defendants' proposed findings contravene the Final Pretrial Order, the contravention is *de minimis* at best. The Court reads Defendants' single post-trial filing to be a combination of their proposed findings of fact and conclusions of law and their post-trial briefing and argument that was filed in lieu of oral closing arguments at trial. This combined filing is the functional equivalent of Plaintiff's separate filings when read together. [*Compare Defendants' Proposed Findings of Fact and Conclusions of Law*, ECF No. 106, *with Plaintiff's Proposed Findings of Fact and Conclusions of Law*, ECF No. 104, *and Plaintiff's First Post-Trial Brief*, ECF No. 105]. Rather than analyzing whether each of Defendants' 193 proposed findings of fact comply with the Court's Final Pretrial Order, the Court's judicial resources are best served by examining the voluminous record, considering the evidence presented at trial, and resolving this case on the merits.

Plaintiff also argues the timing of the post-trial submissions was patently unfair. [ECF No. 107, at 3 n.1]. This argument is unavailing. The submission deadlines were formulated only after conferral with all counsel, and the Court *sua sponte* afforded Plaintiff more time than requested in light of the upcoming holiday. [*See* Vol. IV, at 172].

The ultimate burden to state findings of fact and conclusions of law rests with the trial court and the trial court alone. When called upon to submit proposed findings of fact, counsel's role is merely *to assist* the Court in its Rule 52 obligation. *See Dearborn Nat'l Cas. Co. v. Consumers Petroleum Co.*, 164 F.2d 332, 333 (7th Cir. 1947). A blanket adoption of Plaintiff's proposed findings of fact, as requested by Plaintiff, would constitute an abdication of this Court's judicial function. *See Ramey Const. Co., Inc. v. Apache Tribe of Mescalero Reservation*, 616 F.2d 464, 466 (10th Cir. 1980). The Court is fully aware that the parties' proposed findings are—inherently and understandably—adversarial. *Id.* at 467 n.3. The adversarial approach conflicts with the Court's independent and judicial function as the trier-of-fact. *Id.* It is this very reason that the parties' proposed findings of fact are intended to assist the Court, not to supplant the Court's own independent review of the evidence. *See Nyyssonen*, 342 F.2d at 532–33.

In some circumstances, it may be appropriate to fully adopt a litigant's proposed finding. *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1965). But such an adoption must be based on the trial judge's independent determination that the finding is supported by the evidence, not on a technicality. *See id.*; *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, at 316–17 (1988) ("mere technicalities should not stand in the way of consideration of a case on its merits").

---

Moreover, this argument was raised in a footnote, and arguments made in a perfunctory manner such as this are generally waived. *In re C.W. Min. Co.*, 740 F.3d 548, 564 (10th Cir. 2014).

## FINDINGS OF FACT

After considering the testimony and exhibits admitted at trial, the Court enters the following Findings of Fact in accordance with Rule 52 of the Federal Rules of Civil Procedure. The Court is well aware that overelaboration of detail or particularization of facts is unnecessary. FED. R. CIV. P. 52 (advisory committee notes the 1945 amendment) (internal citations omitted); *Colo. Flying Acad., Inc.*, 724 F.2d at 877 (warning against "inordinately detailed findings"). The findings of fact that follow are extensive, particular, and detailed, but they are not inordinate or unnecessary. Each fact is either material or contextual, although the two are not so distinct in this context.

**The Parties:**

Plaintiff Peter D. Holdings LLC is a Florida limited liability company whose sole member is Peter Dochinez. [ECF No. 1]. Defendant Wold Oil Properties LLC (Wold) is a Wyoming limited liability company that predominantly focuses on the exploration and production of oil and gas in the Rocky Mountain Region. [ECF No. 93, at 2; Trial Tr. Vol. III, at 509–10 (hereinafter referred to by volumes only)]. Chipcore is a Wyoming limited liability company that owns and operates oil and gas leases. [ECF No. 93, at 2].

**Non-Party Entities:**

### BDE and BDED

BDE formally became a Wyoming corporation in 2000 with the stated purpose of exploring CBM in the Powder River Basin. BDE was comprised of the following member managers: Koval was the founder and President of BDE; Steve Onufrak, who was primarily brought on to serve as an accountant, was granted a 1% interest of BDE's parent company; Joe

Breznai and Peter Burns each held a 5% interest. [Vol. I, at 80–82]. At some point, Boyd McMaster was granted some interest in the company. [Vol. II, at 253].

BDED is a Delaware corporation that was formed only after two of BDE's managing members—Burns and McMaster—left and refused to sell back their shares to the company. [Vol. I, at 78; Vol. II, at 253]. Their refusal prompted Koval to start BDED for the sole purpose of serving as BDE's successor company. [Vol. II, at 253]. Despite this intention, Koval continued to use BDE letterhead to communicate with entities, including BLM, Wold, and Chipcore, while other entities referred to the two entities interchangeably.

### *Continental Production Company and Chipcore LLC*

Joe Corbett, Laura Chipperfield, and Scott Chipperfield were business partners in a number of oil and gas production companies, including Continental Production Companies, Continental Industries, and Chipcore LLC. [Vol. IV, at 688–89]. Continental Production was hired by Wold as an independent contractor to develop the Contract Area in March 2009. [*Id.* at 667].

### *Mitchell Resources*

Mitchell Resources was formed for the specific purpose of carrying out the purchase of BDE's and BDED's pledged collateral from S&T Bank. [Defs.' Ex. J, at 3 n.1].

**The Witnesses:**

Collectively, the Court heard from eight witnesses: Eric Koval, Dan Groskop, Kevin Meenan, Don Gould, Joe Corbett, Laura Chipperfield, David Klym, and Dave Shellenberger. A portion of Joseph Breznai's state-court deposition was offered as an exhibit post-trial. The Court observed the demeanor of the witnesses, and has considered any corroborating or impeaching evidence in determining the credibility of each witness.

### Individuals:

Eric Koval is the founder of BDE and President of BDED. [Vol. I, at 77]. Throughout trial, Mr. Koval served as Peter D. Holdings's designated-party representative. Mr. Koval is not, and never has been, an employee, owner, or member of Peter. D. Holdings, and he did not have written authority establishing a principal-agent relationship between himself and Peter D. Holdings. [Vol. I, at 73, 76–77]. Mr. Dochinez merely asked Mr. Koval to prosecute this case as his agent and "basically get his money." [*Id.* at 77].[6]

Joe Corbett is presently the sole owner of Chipcore LLC and Wyoming Energy Consultants, which is also an oil and gas production consulting company. [Vol. III, at 612].

Joseph Breznai was the Chief Operating Officer of BDE beginning in 2016. [ECF No. 106, Ex. 1].

### Landmen/Land managers

Mr. Don Gould served as a landman for a number of oil and gas companies before becoming BDE's land manager in 2006. [Vol. III, at 588–89]. As a land manager, Mr. Gould was tasked with managing BDE's land position and working with BDE's partners, including

---

[6] Mr. Koval's testimony was not credible. First and foremost, Mr. Koval personally owes Mr. Dochinez $32 million [Vol. II, at 316], and Mr. Koval served as Peter D. Holdings's designated party-representative because of Mr. Dochinez's command to "get his money." [Vol. I, at 77]. This fact was not the determinative consideration in examining credibility, however. Instead, it was Mr. Koval's circular description of events. For example, Mr. Koval initially testified the WOGCC well reports demonstrated BDE's timely completion of the wells. When Defendants moved to complete the WOGCC well reports to show the wells were not dewatered until 2009, Mr. Koval testified the WOGCC well reports were of no consequence in determining whether BDE satisfied its contractual obligations because the wells were permitted by the Department of Environmental Quality (DEQ), not the WOGCC. Mr. Koval then testified that BDE reported water discharge to the DEQ, despite Mr. Koval's testimony that BDE was required to purchase stock tanks to dewater the wells because of its lack of DEQ permit to dewater the wells onto the ground. Mr. Koval finally concluded that the wells were permitted by the State Engineer's Office. Additionally, throughout the course of trial, Mr. Koval *mostly* testified there was "no doubt" BDE timely drilled and completed the subject wells, but at times conceded BDE's failure in this regard and relied only on the fact that default did not occur by virtue of BDE timely spudding the subject wells. [Vol. II, 343–45 (repeatedly stating "Default does not occur" or "8.2. 8.2")].

Wold. [*Id.* at 589]. Mr. Gould left BDE in 2009. [*Id.* at 611].[7] He is now the owner of Sheridan Tent & Awning. [*Id.* at 588].

David Klym was Wold's land manager from 1998–2006. [*Id.* at 511; Vol. IV, at 706]. In 2006, Mr. Klym was succeeded by Kevin Meenan who served in that capacity until 2012. [Vol. III, at 507]. As land manager, Mr. Meenan was responsible for supervising the department that handled all lease records, contract records, and negotiating transactions, as well as generally overseeing the land and regulatory side of Wold's energy business. [*Id.* at 508]. Since 2012, Mr. Meenan has served as Wold's general counsel. [*Id.* at 507].

### *Accountants*

Mr. Groskop became BDE's full-time accountant in August 2008 where he was primarily tasked with BDE's invoicing and billings. [Vol. III, at 439, 449, 450]. Mr. Groskop has a Bachelor of Science in accounting, but he is not and has never been a CPA, had never worked as an oil and gas accountant prior to his employment with BDE, and he never received training on COPAS accounting.[8] [*Id.* at 449]. Mr. Groskop left his full-time employment with BDE in November 2011, although he continued to do some contract work for a short time thereafter.[9] [*Id.*].

---

[7] Plaintiff's post-trial submissions suggest that "Mr. Gould is a turncoat ex-employee" whose testimony is not credible. [ECF No. 107, at 7]. There are simply not enough facts in the record to determine the circumstances surrounding Mr. Gould's departure with certainty. When asked about the circumstances surrounding his departure at trial, Mr. Gould stated: "I—had pretty much let everybody go." [Vol. III, at 611]. On the one hand, it is entirely possible that Mr. Gould was terminated or left under questionable circumstances. On the other, however, it is equally possible that BDE was in financial turmoil and let all of its employees go. [*See id.* at 597–99]. At any rate, Mr. Gould did not appear hostile towards BDE or BDED.

[8] COPAS stands for the Council of Petroleum Accountants Services of North America. [Defs.' Ex. F, at 8, 55]. COPAS puts together model forms of JOAs that generally include COPAS's accounting procedures that "pretty much the industry all subscribes to." [Vol. IV, at 711 (Shellenberger)].

[9] On whole, Mr. Groskop's testimony was less credible than the testimony of Defendants' accountants, Mr. Shellenberger and Ms. Chipperfield. Mr. Groskop was inexperienced in oil and gas accounting and untrained in COPAS, which was starkly contrasted by Mr. Shellenberger's COPAS membership and Ms. Chipperfield's extensive experience in oil and gas accounting. Mr. Groskop's lack of training, experience, and overall unfamiliarity with the

Mr. Shellenberger worked for Wold Companies from 1982–2018, serving as Wold's Chief Financial Officer beginning in 2000 until he retired in 2018. Mr. Shellenberger was a CPA and a member of COPAS, and had extensive experience and training in oil and gas accounting and COPAS procedures. [Vol. IV, at 708–11].

Laura Chipperfield has been an oil and gas accountant since 1997. She is currently the accountant for Wyoming Energy Consultants, but she served as the accountant for Continental Production Companies, Continental Industries, and Chipcore in the past. [*Id.* at 688–89].

**Pre-Farmout Agreement:**

In the early 2000s, Wyoming was at the epicenter of a coalbed methane gas boom. Around this time, Wold commissioned a study to examine the potential for coalbed methane development in an area in which it was the Operator of Record. [*See* Vol. III, at 510–11]. The particular area had a Taylor A Unit and a Taylor B Unit. [*See* Vol. I, at 75; Vol. III, at 510–11]. Eventually, the shallow portion of the Taylor Unit—which was the surface of the earth down to the base of the Fort Union Formation—was carved out and renamed the Diamond Run Field by BDE. [*See* Vol. III, at 510–11].

**The Farmout Agreement:**

The parties entered into a Farmout Agreement on September 29, 2003. [Pl.'s Ex. 2, at 1, 17; ECF No. 93, at 3]. By and large, the Farmout governed the parties' rights to and obligations in the development of the "Contract Area," which  spanned 5,424.86 gross acres

---

pertinent contractual agreements at the time of his employment lends substantial support to Defendants' theory that BDE was consistently running afoul of industry practice which was, as discussed more thoroughly below, solidified in both the Letter Agreement and the parties' Joint Operating Agreement. [*See* Pl.'s Ex. 2, at 17].

of land in which Wold had a working interest in 1,997.91 net mineral acres. [*See* Pl.'s Ex. 2, 18–19; Pl.'s Ex. 3, at 2–3].

The Farmout Agreement contemplated BDE earning a percentage of Wold's interest in the Contract Area in two ways. First, BDE agreed to *purchase* 25% of Wold's interest in the Contract Area ("Purchased Interest"). [Pl.'s Ex. 2, at 6]. Second, BDE had the *option to earn* additional interests in the Contract Area through drilling and development and upon its satisfaction of certain conditions ("Earnable Interests"). [*See id.*; *See* Vol. III, at 512].

First, BDE had to drill and complete two Initial Wells on or before December 31, 2003. [Pl.'s Ex. 2, at 7, ¶ 2.1]. To successfully "drill and complete" a well under the Farmout, BDE was required to drill wells that were "capable of producing coal bed methane gas and commence dewatering operations in anticipation of producing coal bed methane gas." [*Id.* at 6, ¶ 1.2]. If BDE did this, Wold would assign 25% of its interest within the Drillsite Spacing Unit surrounding each of the Initial Wells.[10] [*Id.* at 8, ¶ 3.1]. If BDE failed to timely drill and complete the two Initial Wells, all of its right, title, and interest in and to the Farmout would terminate. [*Id.* at 7, ¶ 2.1]. BDE would default, and the Agreement would automatically terminate without notice, if BDE failed to spud the Initial Wells by December 31, 2003. [*Id.* at 10, ¶ 8.2].

Second, and "provided that" BDE timely drilled and completed the Initial Wells, BDE had to drill and complete eight Additional Wells on or before May 1, 2004. [*Id.* at 7, ¶ 2.2]. If

---

[10] "Drillsite Spacing Unit" was defined as "the area within the surface boundaries of the drilling unit, spacing unit or proration unit, as the case may be, established or prescribed as of the date of the Farmout Agreement by field rules or special order of the appropriate regulatory authority for the objective reservoir to be tested or the reservoir in which the Earning Well is completed, if other than the objective reservoir. In the absence of Field Rules or Special Order, the drilling unit shall be 80 acres." [Pl.'s Ex. 2, at 7, ¶ 1.5]. As to both Initial and Additional Wells, the assignment would be limited by depth "from the surface of the earth down to the base of the Fort Union formation." [*Id.* at 8, ¶¶ 3.1, 3.2].

BDE timely drilled and completed the eight Additional Wells, Wold would assign 25% of its interest within the Drillsite Spacing Unit surrounding each of the Additional Wells. [*Id.* at 8, ¶ 3.2]. If BDE failed to timely drill and complete the Additional Wells, BDE's right, title, and interest in and to the Farmout would terminate.  [*Id.* at 7, ¶ 2.2]. BDE would default, and the Agreement would automatically terminate, if it failed to spud the Additional Wells on or before May 1, 2004. [*Id.* at 10, ¶ 8.2].

Third, *if* BDE timely drilled and completed the Initial and Additional Wells, BDE had the option—but not the requirement—to earn an additional 25% of Wold's interest in the remaining portion of the Contract Area. [*Id.* at 8, ¶ 3.3]. To do so, BDE was required to expend the balance of the "Program Deposit," which was a $2.5 million investment commitment, subject to certain conditions. [*Id.* at 8–9, ¶¶ 3.2, 3.3, 3.4, 4.1, 4.2]. First, BDE had to spend the balance of the Program Deposit to "hook up" the Initial and Additional Wells. [*Id.* at 8, ¶ 3.4]. The Farmout defined "hook up" as requiring BDE

> to install such equipment and other facilities as are reasonably necessary to produce coal bed methane gas from the Initial and Additional Wells, including, but not limited to, equipping the wells, installing electrical infrastructure, gas metering, pod house, water handling, water discharge facilities, screw compressors, reciprocating compressors, water lines, gas gathering lines, and sales line entry/tap in cost.

[*Id.* at 8, ¶ 3.4].

If BDE satisfied these conditions, Wold would assign 25% of its interest in the remaining portions of the Contract Area, and the parties would enter into another operating agreement for the development of the remainder of the Contract Area. [*Id.* at 8, ¶ 3.5]. The intent of this provision was for Wold to ultimately transfer 50% of its interest in the Contract Area to BDE. [*Id.*].

In addition to these specific provisions, the Farmout provided that time was of the essence and that all operations were required to be conducted in accordance with all applicable laws and regulations.[11] [*Id.* at 11, ¶ 9.2]. Lastly, BDE was prohibited from assigning its interests without Wold's prior, written consent. [*Id.* at 13, ¶ 11.2].

**The Parties' Performance under the Farmout Agreement**

*Purchased Interest:*

In accordance with the Farmout Agreement and in exchange for $124,869.33, Wold executed an Assignment of Partial Interest in Oil and Gas Lease that conveyed to BDE 25% of Wold's working interest in the Contract Area.[12] [Pl.'s Ex. 3; ECF No. 93, at 3; Pl.'s Ex. 2, at 1–3]. Both the Farmout and the executed Assignment expressly limited BDE's working interest by depth, specifically from the surface of the earth down to the base of the Fort Union formation. [Pl.'s Ex. 2, at 6, ¶ 1.1; Pl.'s Ex. 3, at 1, 3]. This assignment was duly recorded on October 16, 2003. [ECF No. 93, at 3].

In November 2003, BDE discovered that Woods Research and Development owned a portion of the interest Wold represented it owned. [Pl.'s Ex. 4]. This interest was subsequently allocated such the interest it bargained for. [Vol. IV, at 724–25].

---

[11] Despite this provision, Plaintiff argues in its post-trial brief that Defendants erroneously rely on regulatory requirements that neither the Farmout nor the law contemplate. Even if the Farmout did not require BDE to conduct its operations lawfully, the law would require as much. *See Kirkwood v. CUNA Mut. Ins. Soc.*, 937 P.2d 206, 211 (Wyo. 1997) ("Parties to an agreement are presumed to know the law and to have contracted with reference to existing principles of law. These existing principles of law enter into and become a part of a contract as though referenced and incorporated into the terms of the agreement.")

[12] The parties agreed to a purchase price of $250 per net mineral acre. Based on Wold's ownership in the Contract Area, BDE purchased a working interest in 499.47733 net mineral acres. $250 x 499.47733 = $124,869.33.

***Earnable Interests:***

BDE timely spudded all Initial and Additional Wells.[13] [Defs.' Exs. FF, GG].  BDE

failed, however, to timely complete the Initial and Additional Wells. As noted earlier, BDE

was required make the Initial and Additional Wells "capable of producing coal bed methane

gas *and* commence dewatering operations in anticipation of producing coal bed methane gas."

[Pl.'s Ex. 2, at 6, ¶ 1.2 (emphasis added)]. Based on BDE's own reporting to the WOGCC, the

Initial Wells were capable of producing gas on January 12 and January 16, 2004, respectively.

Seven of the Additional Wells were capable of producing gas in April 2004, and one was

capable of producing gas as of May 2, 2004.[14] Accordingly, BDE failed to meet the deadlines

provided for in the Farmout for both Initial Wells and one Additional Well.

BDE also failed to commence dewatering operations on all subject wells. [Vol. III, at

518 (Meenan), 626 (Corbett); Vol. II, at 36 (Koval); Defs.' Ex. Q, at ¶ 4 (Wyoming state court

opinion finding "BDE never completed any of the wells in POD I[.]"); Pl.'s Ex. 14, at 2, ¶ 3

(WOGCC opinion finding BDE did not meet the Farmout's completion requirements); Pl.'s

Ex. 24, at 12].

In the context of CBM wells, "dewatering" occurs when water is produced off the coals

to reduce the hydrostatic pressure and produce gas. [Vol. I, at 64 (Koval); Vol. III, 617

---

[13] The Initial Wells were spudded on December 23 and December 29, 2003, respectively. The Eight Additional Wells were spudded on March 22, March 23, March 24, March 25, March 26, March 29, March 30, and March 31, 2004. BDE reported the spudding dates for the ten wells to the WOGCC. The Farmout does not define "spudded," but the WOGCC defines it as occurring when a party commences operations for drilling of a gas well. WOGCC Rules & Regs 055.0001.1 § 2(zz) (Definitions).

[14] The Initial and Additional Wells were permitted as gas wells and, as such, were governed by the WOGCC. As Operator of Record at the time, BDE was required to report a variety of occurrences to the WOGCC, including when the wells were spudded and completed and when the wells produced water or gas. By BDE's own reporting, the wells were "completed" by these dates, but importantly the WOGCC's definition of "completion" references only when the wells were capable of producing gas; they do not reference when or if BDE timely commenced dewatering operations. WOGCC Rules & Regs 055.0001.1 § 2(p) (Definitions).

(Corbett)]. Thus, dewatering is a prerequisite to gas production.[15] [*See id.*].When water is produced off the coals, the water must be properly stored or otherwise disposed of and the water production must be reported to the WOGCC. [Vol. III, at 618; Vol. IV, at 647–48; Vol. II, at 336, 337; Defs.' Ex. FF, at 1]. The first-time water was reported as being produced from the Initial Wells was in 2009 when Wold was Operator of Record.[16] [Defs.' Ex. FF, at 1–2; Defs.' Ex. GG; Vol. II, at 337; Vol. III, at 620].

The parties never modified the Farmout Agreement. [Vol. II, at 336]. Moreover, it is common industry practice for a farmee to demand a conveyance of the earned assignments, or at the very least notify the farmor that the earnable assignments have indeed been earned. [Vol. III, at 518 (Meenan); Vol. IV, at 707 (Klym)]. Neither BDE nor BDED made an oral or written demand for the assignments surrounding the Drillsite Spacing Units of the Initial or Additional Wells.

---

[15] Plaintiff argues BDE's failure to "drill and complete" the wells was immaterial because the term was not capitalized. [Vol. II, at 415–16; ECF No. 105, at 4 (stating if BDE breached by failing to dewater the wells, the breach was nonmaterial and "conjured up")]. This argument is wholly unavailing; as a prerequisite to the production of gas, the dewatering of wells—which was included in the Farmout's definition of drill and complete—forms the basis of the entire Agreement.

[16] BDE apparently purchased ten electric generators to dewater the wells and five 210-barrel stock tanks to store the water produced from all ten wells. [Vol. I, at 103]. Assuming this to be true, the maximum storage capacity available to BDE was 1,050 barrels of water. In 2009, the *Initial Wells* produced 3,540 and 4,725 barrels of water, respectively. [Defs.' Exs. FF, GG]. It is mathematically implausible for BDE to have successfully and timely dewatered all ten subject wells with just 1,050 barrels of storage capacity.

At trial, both parties discussed how, at some point, the Initial and Additional Wells began naturally flowing CBM gas as a result of other entities dewatering the surrounding wells. [Vol. I, at 66, 104 (Koval); Vol. III, at 617; Vol. IV, at 673; Pl.'s Ex. 34, at 1]. None of the parties elaborated on whether this modified or vitiated BDE's obligation to dewater the subject wells, but even if it did, Plaintiff failed to establish the natural flow occurred within the deadlines prescribed by the Farmout.

### *The Program Deposit:*

As an investment commitment, BDE was required to spend $2.5 million in the Contract Area, which is referred to as the "Program Deposit." The parties agreed the Program Deposit could be proportionately reduced in the event BDE was unable to purchase or obtain commitments from Wold's Cotenants. [Pl.'s Ex. 2, at 9, ¶ 4.1].

For $15,400, BDE acquired 56 net mineral acres from Linda Sue Henry, one of Wold's Cotenants. [Pl.'s Ex. 17, at 23; *See* Pls.' Ex. 6]. Accordingly, BDE was unable to acquire an interest in 3,470.96 acres, or 62.82%, of the Contract Area.[17] This lack of acquisition proportionately reduced the Program Deposit to $929,500.[18] [Pl.'s Ex. 17, at 2; Pl.'s Ex. 20, at 1].

Under the Farmout, BDE was to receive a credit for the following expenses: (1) the purchase of Wold's and Wold's Cotenants' working interest in the Contract Area; (2) the

---

[17] Wold had a working interest in 1,997.91 acres. BDE purchased a 25% interest in Wold's acreage, which gave BDE a working interest in 499.47 net mineral acres. 499.47 + 56 = 555.47. The entire field was 5,524.86 acres. Wold maintained its interest in 1,498.43 net mineral acres. Together, Wold and BDE held interests in 2,053.90 net mineral acres of the 5,524.86 net mineral acres in the Contract Area. Accordingly, BDE was unable to obtain an interest in 3,470.96 net mineral acres, or 62.82% of the Contract Area.

[18] $2,500,000 – ($2,500,000 * 62.82%) = $929,500. [*See* Pl.'s Ex. 2, at 9]. Plaintiff offered several other calculations at trial. The Court expressly rejects all of them. The $929,500 was reached based on the Court's independent calculation. This result was supported by the evidence, including emails authored by BDE's own employees. [Pl.'s Exs. 17, 20]. For comparison, Plaintiff first said the proper amount was $861,785.28 [Pl.'s Ex. 6]. At trial, Koval testified this was the correct amount because it was a multiplication of "the acres earned by Black Diamond, divided by the total number of acres within the unit per the calculation in the Agreement[.]" [Vol. I, at 139]. The proportionate reduction of the Program Deposit has nothing to do with what BDE earned, but everything to do with the acreage that BDE was *unable* to earn or purchase from Wold's Cotenants. [Pl.'s Ex. 2, at 9]. Therefore, this calculation is rejected. Then in the same exhibit, Plaintiff's calculations demonstrate the Program Deposit was actually $687,442.31 as of June 2016, [Pl.'s Ex. 6, at 4], roughly nine years after the Farmout terminated. [Pl.'s Ex. 13]. When the parties were finalizing the terms of the Letter Agreement, a draft version indicated the proper amount was $919,933. [Pl.'s Ex. 24, 1]. This statement was removed from the executed Agreement. [*Id.* at 3]. Finally, Koval relied on alleged representations of David Klym to establish the proper amount was $904,000. To the extent David Klym represented this figure in pre-Farmout negotiations, it was premised on discussions surrounding BDE earning 50% of Wold's interest rather than purchasing 25% and earning 25%. [*See* Pl.'s Ex. 1 (referencing the "previous agreement" and the current agreement when discussing the proper amount). These competing numbers further demonstrate the circular nature of Plaintiff's claims and Koval's testimony.

drilling and completion of Initial and Additional Wells; (3) the construction and installation of facilities needed to explore and produce CBM, including but not limited to the costs to "hook up" the Initial and Additional Wells; and (4) any other expenses reasonably incurred while exploring, drilling, and producing CBM in the Contract Area. After these credits were accounted for, the balance of the Program Deposit was $23,608.04.[19]

To earn 25% of Wold's remaining interests in the Contract Area, BDE was required to expend the remaining $23,608.04 to "hook up" the Initial and Additional Wells, and it was required to spend this balance within one year of drilling and completing the last Additional Well. BDE failed in all respects. First, it failed to "hook up" any of the subject wells and, by failing to complete any Additional Well, the one-year requirement was never triggered. [Vol. III, at 556 (Meenan)]. BDE also failed to "hook up" the Initial and Additional Wells. [*Id.* at 525 (Meenan), 616 (Corbett); Vol. IV, at 798 (Koval stating it "hooked up" the wells by making them available to produce water into the stock tanks with electricity, portable generators); Pl.'s Ex. 13, at 1; Pl.'s Ex. 14, at 2, ¶ 3 (stating BDE did not expend the Program Deposit and did not meet the hookup requirements); Pl.'s Ex. 24, at 12].

TERMINATION OF THE FARMOUT AGREEMENT

The Farmout was to remain in effect until BDE's rights to earn the additional assignments expired without BDE earning them or until BDE earned the assignments and neither of the parties had any additional rights or obligations. [Pl.'s Ex. 2, at ¶ 15]. Wold formally terminated the Farmout Agreement on December 28, 2007, by providing BDE with

---

[19] $929,500 – $124,869.33 (BDE's purchase of Wold's 25% interest) – $15,400 (BDE's purchase of Linda Sue Henry's interest) – $765,622.63 (BDE's expenses to drill and complete the Initial and Additional Wells [Pl.'s Ex. 6, at 1]).

written notice that it's right to earn the additional assignments expired without BDE earning them. [Pl.'s Ex. 13].

The Farmout's termination ended BDE's right to earn additional interests throughout the Contract Area, but it did not terminate, transfer, or release any rights, title, and interest BDE had previously acquired, specifically with respect to equipment, fixtures, and other tangible assets throughout the Contract Area.  [Pl.'s Ex. 2, at 9; Defs.' Ex. Q].

**THE LETTER AGREEMENT**

Despite the Farmout's termination, BDE continued to develop wells in the Contract Area. In POD I specifically, BDE drilled an additional four wells. It was understood amongst the parties that these four wells were outside the Farmout Agreement. [Vol. I, at 119 (Koval); *See* Pl.'s Ex. 24, at 10–11].

On July 1, 2008, BDE sent Wold a bill for $125,619 to account for Wold's proportionate share of expenses in its continued development. Wold did not pay this amount. On August 1, 2008, BDE sent Wold a bill for $585,522, which included the $125,619 outstanding from July 1 and an additional $459,903 for the month of August. [Pl.'s Ex. 20, at 1]. Wold did not pay this amount.

On September 23, 2008, BDE sent Wold an invoice $708,307.79. [Pl.'s Ex. 21]. This invoice included costs for wells BDE agreed to carry under the Farmout Agreement and those costs associated with water and gas pipe infrastructure expenses, although it failed to describe the size and footage of the infrastructure as required under COPAS's accounting procedures. [*See* Defs.' Ex. F, at 55; Pl.'s Ex. 24, at 10; Vol. IV, at 720]. Wold objected to the September 23rd invoice on these grounds.

This disagreement prompted the parties to enter into the Letter Agreement for the specific purpose of outlining the parties' allocation of costs moving forward. The Letter Agreement had four distinct parts: (1) BDE agreed to carry all well and infrastructure expenses for fourteen wells—the ten Farmout wells plus the four wells drilled after the Farmout's termination—until the wells were completed, electrified, dewatered, and hooked-up to sales; (2) Wold agreed to bear its proportionate share of expenses for any wells drilled after January 1, 2008, so long as the JIBs were submitted according to standard JOA guidelines and the COPAS accounting procedures; (3) BDE agreed to submit JIBs for the New Wells without delay; and (4) Wold agreed to sign a JOA upon its approval of the JIBs. [Pl.'s Ex. 24, at 11–12]. BDE executed the Letter Agreement on October 6, 2008; Wold, on October 9, 2008. [*Id.* at 12].

The JOA's standard guidelines required BDE, as Operator of Record, to promptly pay and discharge expenses incurred in the development and operation of the Contract Area. [Defs.' Ex. F, at 8]. According to the COPAS, BDE was required to send all non-operators a joint interest billing (JIB) on or before the last day of each month for their proportionate share of expenses for the preceding month. [*Id.* at 55]. Each JIB was required to be accompanied by statements identifying the authority for the expenditures and some materials (*e.g.*, water or gas pipe infrastructure) were to be identified separately and described fully in detail. [*Id.*].

### THE PARTIES' PERFORMANCE UNDER THE LETTER AGREEMENT

At the time the Letter Agreement was executed, Mr. Groskop was BDE's accountant. Mr. Groskop was never provided with a copy of the Letter Agreement, the JOA, or the COPAS. [Vol. III, at 450–51].

24

### October 16, 2008 JIB

On October 16, 2008, BDE sent Wold a JIB for $689,975.78. [Pl.'s Ex. 26, at 2]. Wold paid $684,055.51 of this amount. [Defs.' Ex. CC; Vol. IV, at 716]. Wold objected to the remaining $5,920.27 balance because the JIB failed to include an invoice for a particular well as required under the COPAS. [Pl.'s Ex. 26, at 2; Defs.' Ex. CC; Vol. IV, at 716]. Wold subsequently requested a proper invoice for the well, once on December 10, 2008, and again on January 23, 2009. [Vol. IV, at 715; Defs.' Ex. II, at 1; Defs.' Ex. HH; Vol. III, at 469]. BDE never sent a proper invoice for the well, and therefore Wold never paid the outstanding amount. [Vol. IV, at 715; Defs.' Ex. II, at 1; Defs.' Ex. HH; Vol. III, at 469].

### December 3, 2008 JIB

On December 3, 2008, BDE sent Wold a JIB for $480,641.62. [Pl.'s Ex. 29]. On January 12, 2009, Wold paid $58,908.32 of this amount. [Defs.' Ex. DD].The outstanding amount, $421,733.30, was for wells BDE agreed to carry under the Letter Agreement but nevertheless billed to Wold. [*See* Pl.'s Ex. 29; Vol. IV, at 719; Defs.' Ex. II]. Wold never paid the outstanding amount.

### The Joint Operating Agreement

BDED—rather than BDE—signed the JOA on August 14, 2008. [Defs.' Ex. F, at 25]. BDED was also listed as the Operator on the front page of the agreement, but BDE was used throughout the Article V's description of the Operator of Record. [Defs.' Ex. F, at 1, 8]. Wold signed the JOA on October 22, 2008. [*Id.* at 26; Defs.' Ex. Q, at 4].[20] Despite its execution in

---

[20] Two different JOAs were presented to the Court: Plaintiff's Exhibit 9 and Defendants' Exhibit F. Although the two exhibits are purportedly the "same document," a few differences are notable. First, they have different Exhibit As reflecting different percentages of ownership for Wold and BDE. Plaintiff's Exhibit 9 reflects BDE's ownership as if it had earned the additional 25% interests under the Farmout; Defendants' Exhibit F reflects BDE's ownership without the additional 25% interests. [Vol. III, at 532–33 (Meenan)]. Second, Plaintiff's Exhibit 9 is only sixty-four

2008, the JOA became retroactively effective as of August 1, 2007. [Defs.' Ex. F, at 1]. The

executed JOA was duly recorded. [Vol. III, at 563; Pl.'s Ex. 33].

### BDE'S FINANCIAL STRUGGLES AND RESIGNATION AS OPERATOR OF RECORD

As Operator, BDE was required to pay all contractors, suppliers, wages, and salaries

for services rendered or performed in the Contract Area, and was required to keep the Contract

Area free from liens and encumbrances. At some point, liens totaling $405,000 were placed

on the Contract Area by various service providers as a result of BDE failing to pay such

invoices. [Defs.' Ex. Q, at 3; ECF No. 106, Ex. A, at 6]. BDE failed to pay the liens. [Defs.'

Ex. Q, at 3; Vol. III, at 597–99 (stating BDE's financial situation was "extremely poor"); Pl.'s

Ex. 31]. This led to BDE resigning as Operator of Record effective March 1, 2009. [Pl.'s Exs.

31, 32; Vol. III, at 599, 601–02].

It is common industry practice that, once an operator resigns, it will deliver to the other

working interest owners any inventory or equipment that is jointly owned.  [Defs.' Ex. Q, at ¶

20]. On June 30, 2009, BDE voluntarily delivered approximately $575,000 worth of inventory

and equipment to the Contract Area. [*Id.*; Vol. IV, at 657–58; Vol. III, at 546]. BDE did so

without any request from or any communication with Wold or any other working interest

owner. [Defs.' Ex. Q, at 4; Vol. IV, at 657; Vol. III, at 373]. The equipment and inventory was

subsequently used by all working interest owners, including Wold and Chipcore, in the

---

pages; Defendant's Exhibit F is eighty-five pages. Defendants' Exhibit F contains actual signatures from Wold and
BDE representatives; Plaintiff's Exhibit 9 does not. Plaintiff argues that "Wold actually changed the Exhibit A and
put it onto the form of JOA that was signed by Wold" and recorded the JOA reflecting the incorrect ownership
interests. [*Id.* at 568]. There is nothing in the record to suggest that Wold wrongfully changed the ownership interests
on Exhibit A or that it was wrongfully recorded by Wold later on. The Court adopts Defendants' Exhibit F as the
accurate, proper, and controlling JOA. The fact that the Exhibit F version was recorded in April 2009 merely lends
inference to the fact that Wold recorded it when it became Operator of Record and BDE failed to record the JOA—
the purpose of which is to effect a security interest across the contract area—while it was Operator of Record. [*See id.*
at 568–69].

development and ultimate production of wells in POD I. [Defs.' Ex. Q, at ¶ 24]. To this day, BDE holds title to the equipment and inventory. [Vol. II, at 374; Defs.' Ex. Q, at 9–10 (state court finding BDE entitled to reimbursement)].

**WOLD AS SUCCESSOR-OPERATOR:**

Wold took over as Operator of Record effective March 1, 2009. [Vol. IV, at 713; ECF No. 93, at 4, ¶ 14]. As Operator, Wold sent monthly JIBs and revenue statements to all working interest owners, including BDE. [Vol. III, at 470, 474 (Groskop); Vol. III, at 733, 734 (Shellenberger)].

After BDE failed to pay its JIBs, Wold sent BDE a Notice of Default on October 29, 2009, which BDE failed to cure. [Defs.' Ex. G; Vol. II, at 399 (Koval: Did we cut a check? No we did not.")]. On November 30, 2009, Wold sent BDE a Notice of Suspension of Rights and Notice of Non-Consent Election, which effectively suspended all of BDE's rights arising under the JOA, deemed it a non-consenting party with respect to the listed wells, and placed a 300% penalty on all of BDE's proportionate share in the wells. [Defs.' Ex. H, at 1; Defs.' Ex. F; Vol. III, at 540–51; Vol. II, at 399].

**MITCHELL RESOURCES**

To raise operational capital, the BDE Entities obtained roughly $32 million in loans from S&T Bank, which were all secured by leasehold mortgages and security interests in most of BDE's and BDED's assets [Defs.' Ex. I, at 5].

In January 2011, S&T Bank agreed to assign the BDE Entity loans, including those secured by BDE's and BDED's assets, to Mitchell Resources for $1 million. [Defs.' Ex. I, at 6]. Mitchell Resources then agreed to assign the loan obligations to BDE and BDED in exchange for their provision of the $1 million, in addition to Mitchell Resources receiving

$65,000 cash and certain leasehold rights on the subject wells in POD I. [*Id.*]. Importantly, these assignments contemplated a conveyance of all promissory notes, security agreements, mortgages, assignments, pledges, and loan agreements, as well as "all other instruments" evidencing and securing BDE's debt. [*Id.*].

In March 2011, BDE and BDED transferred the $1 million to S&T Bank, and S&T Bank transferred all of the BDE Entity loan instruments to Mitchell Resources. On June 20, 2011, Mitchell Resources sent Wold a Notice of Intent to foreclose on the mortgages. In lieu of foreclosure, Dochinez agreed to accept the deed to the POD I field office as well as other BDE- and BDED-owned properties. [Vol. II, at 255]. BDE and BDED also arranged for Dochinez to receive the assignment of the S&T loans from Mitchell Resources.

When Mitchell Resources failed to assign the S&T loans, Dochinez, BDE, and BDED filed suit against Mitchell Resources in Pennsylvania state court for breach of contract damages and specific performance.  [Defs.' Ex. J]. In June 2012, the parties reached a settlement agreement, which provided that (1) most of BDE's and BDED's assets, equipment, and inventory would be conveyed to Mitchell Resources in exchange for $18 million; and (2) Mitchell Resources would convey the S&T loan obligations to Dochinez.[21]  [*Id.* at 5, 23–24; Defs. Ex. L, at 1]. While this specific settlement agreement was never enforced, the S&T loan obligations were eventually conveyed to Peter D. Holdings on March 26, 2014. [Pl.'s Ex. 47, at 1].

---

[21] The only inventory excluded from this conveyance was nineteen pump jacks. [Defs.' Ex. J, at 5].

**PETER D. HOLDINGS ASSIGNMENT:**

Effective June 1, 2014, BDE executed an Assignment of Partial Interest in Oil and Gas Lease that assigned to Peter D. Holdings all of BDE's working interest in the Contract Area. [Pl.'s Ex. 50; Vol. II, at 252].

On October 29, 2014, BDE sent Wold a Notice of Default under the POD I JOA for failing to pay its outstanding JIBs, reconcile inventory and credits for the inventory. [Pl.'s Ex. 55]. The Notice of Default does not discuss any failure to assign additional interests within the Contract area. [*See* Pl.'s Ex. 55; Vol. III, at 546 (Meenan)].

**CHIPCORE TAKES OVER AS OPERATOR OF RECORD**

On August 1, 2014, Wold executed an assignment, bill of sale, and conveyance, which conveyed all of its right, title, and interest in the Contract Area to Chipcore. [Defs.' Ex. O; Pl.'s Ex. 54]. On September 1, 2014, Chipcore became the Operator of Record for the Contract Area. [ECF No. 93, at 4, ¶ 17]. As Operator, Chipcore sent out monthly JIBs and revenue statements and quarterly payout statements to each working interest owner, including Peter D. Holdings. [Vol. IV, 690–92].

Chipcore also sent Peter D. Holdings 1099s from 2015–2018 that showed $394,461.79 in total gross revenues. [Pl.'s Ex. 63; Vol. II, at 247, 294; Vol. IV, at 693]. Peter D. Holdings has never received any of this revenue, [Vol. II, at 247], but only because its proportionate share of taxes and expenses exceeded the amount of gross revenue. [Vol. IV, at 694–95 (Chipperfield); Vol. IV, at 749–50 (Shellenberger)].

**THE LAWSUITS:**

In 2015, Peter D. Holdings and BDED filed suit against Wold and Chipcore in Wyoming state court asserting claims for unjust enrichment, conversion, and violations of the Wyoming Royalty Payment Act, and seeking an accounting and monetary damages.

On May 6, 2015, Peter D. Holdings and BDED filed suit against Wold and Chipcore in the United States District Court for the Western District of Pennsylvania asserting the exact same causes of action at issue in this case. [ECF No. 104, at 6, ¶ 20 (citing *Peter D. Holdings LLC v. Wold Oil Properties LLC*, 15-cv-592-H (W.D. Penn. May 6, 2015)). Peter D. Holdings and BDED voluntarily dismissed the Pennsylvania suit after Wold and Chipcore challenged venue. *Id.*

Peter D. Holdings then filed a similar Complaint in this Court on December 28, 2017, asserting claims for rescission, quantum merit, accounting, specific performance, breach of contract, and tortious interference, and seeking an accounting and monetary damages.[22] [ECF No. 1].

## CONCLUSIONS OF LAW

The Court has diversity jurisdiction under 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391(a).

As a federal court sitting in diversity, the law of the forum state applies to substantive issues and federal law applies to procedural issues. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78

---

[22] Wold Energy Partners LLC was also a named-Defendant that was subsequently and voluntarily dismissed with prejudice. The original Complaint included BDED as a "party" in the body of the Complaint, but the case caption has never included BDED as a party to this lawsuit. [*See* ECF No. 1, at 1, ¶ 2; *See* ECF No. 14, at 2 n.1]. When Plaintiff filed its Amended Complaint in this action on August 29, 2018, it removed BDED as a party following Defendants' Motion to Dismiss for lack of diversity jurisdiction. [ECF Nos. 16, 17; *Compare* ECF No. 23, at 1, *with* ECF No. 1, at 1]

(1938); *Am. Fidelity & Cas. Co. v. All Am. Bus Lines, Inc.*, 179 F.2d 7, 11 (10th Cir. 1949). Wyoming is the forum state in this case.

Plaintiff has four remaining causes of action: (1) breach of contract with respect to the Farmout Agreement, for which Plaintiff seeks specific performance or, alternatively, rescission; (2) breach of contract with respect to the Letter Agreement, for which Plaintiff seeks monetary damages or, alternatively, unjust enrichment; (3) conversion, for which Plaintiff seeks monetary damages; and (4) an accounting. Each claim will be addressed in turn.

## REAL-PARTY-IN-INTEREST:

Defendants assert Peter D. Holdings is not the real-party-in-interest for any claims prosecuted at trial.[23] While not a jurisdictional prerequisite, the Court considers this issue first.

The Federal Rules of Civil Procedure require every action to be prosecuted in the name of the real party in interest. FED. R. CIV. P. 17(a). A real party in interest is one that has an enforceable right under applicable substantive law. *See K-B Trucking Co. v. Riss Inter'l Corp.*, 763 F.2d 1148, 1153 (10th Cir. 1985). As the forum state, Wyoming law will determine whether Plaintiff has an enforceable substantive right such that it is the real-party-in interest under the Federal Rules. *Id.* (stating the forum state's procedural rule detailing who may sue in state courts is inapplicable); *see also Audio-Visual Marketing Corp. v. Omni Corp.*, 545 F.2d 715, 719 (10th Cir. 1976) (stating

---

[23] Plaintiff argues Defendants waived the real-party-in-interest defense by litigating the Wyoming state court action to final judgment without raising this concern. This argument is unavailing. In opposing Defendants' Motion for Summary Judgment on the issue of collateral estoppel and res judicata, Plaintiff argued "the nature of the claims here are completely different." If the claims in this action are truly different, as Plaintiff maintained on summary judgment, the state court action is irrelevant to the determination of whether Defendants waived the defense with respect to *these* claims. Even if Plaintiff had not made these contradictory arguments, this particular argument is unpersuasive. In some instances, a failure to timely raise a real-party-in-interest defense may operate as a waiver of that defense. *Fed. Deposit Ins. Corp. v. Bachman*, 894 F.2d 1233, 1236 (10th Cir. 1990). However, Defendants' real-party-in-interest challenge is substantively equivalent to a Rule 12(b)(6) failure-to-state-a-claim challenge and therefore it is afforded the protection of Rule 12(h)(2). *See Audio Visual Marketing Corp. v. Omni Corp.*, 545 F.2d 715 (10th Cir. 1976) (citing WRIGHT & MILLER, *Fed. Prac. & Proc.* § 1554, 700–04).

the question of whether the assignee is the real-party-in-interest is considered under the substantive law of the forum state).

"If an assignment is full and complete and all the rights have been transferred, the assignee is the real party in interest." *Dunham v. Robertson*, 198 F.2d 316, 319 n.8 (10th Cir. 1952) (applying Wyoming law) (citing cases). "The assignee of an oil and gas lease acquires the interest of his assignor." *Champion Ventures, Inc. v. Dunn*, 567 P.2d 724, 728 (Wyo. 1977). An assignee cannot acquire rights that are greater than those of his assignor. *Id.*

The only assignment BDE conveyed to Peter D. Holdings was the Assignment of Partial Interest in Oil and Gas Lease, which conveyed to Peter D. Holdings all of BDE's working interest in the Contract Area. [Pl.'s Ex. 50]. This conveyance mirrored the interest Wold conveyed to BDE pursuant to the Farmout's Purchased Assignment provision. [*Compare* Pl.'s Ex. 3, *with* Pl.'s Ex. 50]. Accordingly, Peter D. Holdings is the real-party-in-interest with respect to any claims arising from Wold's allegedly incomplete conveyance under the Purchased Assignment.

Any additional substantive rights Peter D. Holdings has as a result of this conveyance turns on the interpretation of "working interest." Assignments are contracts and, as such, are construed according to the well-accepted principles of contract interpretation. *Hickman v. Groves*, 2003 WY 76, ¶ 6, 71 P.3d 256, 258 (Wyo. 2003). The ultimate goal of contract interpretation is to determine the parties' intent. *Mullinnix, LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 22, 126 P.3d 909, 919 (Wyo. 2006). To do so, the Court first looks to the provision at issue to discern its plain meaning. *Id.* If the provision is clear and unambiguous, construction is inappropriate and the Court will enforce the terms and provisions as stated within the four corners of the agreement. *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). If a provision is ambiguous, however, construction becomes appropriate and the

Court may consider a number of factors, such as the context in which it was written, the surrounding circumstances, the subject matter, and the purpose of the agreement, to ascertain the parties' intentions. *Stone v. Devon Energy Prod. Co., L.P.*, 2008 WY 49, ¶ 18, 181 P.3d 936, 942 (Wyo. 2008).  A provision is ambiguous if its meaning is obscure or indefinite. *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 220 (Wyo. 1994). The parties' disagreement as to a provision's meaning does not create ambiguity. *Id.*

As a general rule, contract provisions are afforded their plan and ordinary meaning at the time the parties' entered into the agreement. *Boley v. Greenough*, 22 P.3d 854, 858 (Wyo. 2001). This principle applies to technical terms, such as those used in the oil and gas context. *See id.* Black's Law Dictionary defines "working interest" as "[t]he rights to the mineral interest granted by an oil-and-gas lease, so called because the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas, as well as the obligation to pay all costs." *Working Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019). Merriam Webster's dictionary defines "working interest" as "the interest of a party that holds the right to oil, gas, or minerals on a property and that bears production costs." *Working Interest*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/interest#legalDictionary (last visited Aug. 4, 2020). Wyoming's Royalty Payment Act defines "working interest" as "the interest granted under an oil and gas lease, giving the lessee the right to work on the leased property to search for, develop, and produce oil and gas and the obligation to pay all costs and production."[24] WYO. STAT. ANN. § 30-5-304(a)(viii) (1989).

---

[24] In *Boley v. Greenough*, the Wyoming Supreme Court found that a different subset of this statute was inapplicable in determining the parties' intent to the contract, but only because the definition was enacted over twenty years *after* the assignments at issue were executed. 22 P.3d 854, 858 (Wyo. 2001). The Court limited the holding "to the specific facts of the case." *Id.* In *Boley*, the assignments were executed in the late 1960s, and this provision was last amended/altered/enacted in 1989. Wold assigned 25% of its working interest to BDE in 2003, and BDE assigned

The legal, ordinary, and statutory definitions of "working interest" are substantially similar. These similarities compel a finding that the term "working interest" unambiguously encompasses certain rights with respect to the development of oil and gas leases, as well as the obligation to pay for expenses associated with such development. As such, Plaintiff is the real-party-in-interest with respect to its accounting claim insofar as it seeks an accounting for revenues and expenses arising from its 25% working interest that was assigned in June 2014. For the following reasons, however, Plaintiff is not the real-party-in-interest with respect to any claims arising from Wold's alleged breach of the Farmout and Letter Agreements.

Peter D. Holdings's acquisition of the S&T Loan Obligations is insufficient to demonstrate it is the real-party-in-interest with respect to the remaining claims premised on allegations that Wold materially breached the Farmout and Letter Agreements. As the mortgagee of the many obligations it acquired, Peter D. Holdings may very well have a cause of action arising from the promissory notes. But there is no evidence in the record to establish these loan obligations encompassed any substantive rights arising under the Agreements. Without a proper assignment conveying as much, Peter D. Holdings, as the mortgagee, is not the real-party-in-interest in claims arising from the alleged breach of the Agreements.[25] *See Kilmer v. Citicorp Mortg., Inc.*, 860 P.2d 1165, 1168–69 (Wyo. 1993) (citing *Platte Valley Savs. by Resolution Trust Corp. v. Crall*, 821 P.2d 305, 307 (Colo. Ct. App. 1991) (holding that, without the proper assignments being made between the mortgagee and the defendant, the mortgagee was not real-party-in-interest under the applicable contract)).

---

its interest to Peter D. Holdings in 2014. Thus, the statute is applicable to the determination in this case. However, the Boley *Court* limited its holding "to the specific facts of the case." *Id.*

[25] Even if BDE had assigned its rights under the Farmout Agreement to Peter D. Holdings, the assignment would constitute a material breach under the Farmout's plain and unambiguous terms. [Pl.'s Ex. 2, at 13, ¶ 11.2].

Plaintiff has also failed to establish it is the real-party-in-interest with respect to its claim for conversion. To date, BDE holds title to the equipment and inventory. BDE's title to the property makes it the real-party-in-interest as to that claim. *See Mari v. Rawlins Nat'l Bank of Rawlins*, 794 P.2d 85, 89 (Wyo. 1990), *rev'd on other grounds*, *Trefren Const. Co. v. V&R Const., LLC*, 2016 WY 121, 396 P.3d 317 (Wyo. 2016).  Indeed, it is *BDE* that would either enjoy a benefit or suffer an injury as a result of any judgment, and therefore it is *BDE* that is the real-party-in-interest as to this claim. [*See* Defs.' Ex. Q (finding BDE, not Peter D. Holdings, was entitled to reimbursement for the equipment and inventory)].

### Judicial Estoppel

Plaintiff argues it is the real-party-in-interest by virtue of BDE and BDED's de facto consolidation in 2007. [ECF No. 104, at 7, ¶¶ 22–28; *Id.* at 14, ¶ 1]. The Court declines to consider whether such a consolidation would alter the outcome of its real-party-in-interest determination. Instead, the Court exercises its discretion to judicially estop BDE from making this factual argument.

Judicial estoppel is an equitable remedy designed to protect the integrity of the judicial process. *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1207 (10th Cir. 2017). When invoked, the doctrine prohibits a party "from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Judicial estoppel is a "powerful weapon to be used only when less forceful remedies are inadequate[.]" *Asarco, LLC*, 844 F.3d at 1207–08. Courts are generally reluctant to invoke it and thus apply it "both narrowly and cautiously[.]" *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011).

Three factors are particularly relevant to the Court's determination: (1) whether the party took a position that is clearly inconsistent with its earlier position; (2) whether adopting the later position would create the impression that either the first or the second court was misled; and (3) whether allowing the party to change its position would give it an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire*, 532 U.S. at 750–51.

In a recent case before the Wyoming Supreme Court, BDED took a clearly inconsistent position than the one asserted here. Namely, in *Black Diamond Energy of Delaware, Incorporated v. Wyoming Oil & Gas Conservation Commission*, BDED asserted the following:

> The dispute between the parties stems from the State treating BDED and [BDE] as the same entity. This is not the case. Appellant BDED is a Delaware corporation formed in 2007. [BDE] is a Wyoming corporation in 2000. Although both companies are oil and gas exploration and production companies, they hold separate interests, post separate bonds, and have been separately owned and managed.

[ECF No. 108, at 10 (quoting BDED's appellate brief)]. These factual assertions were reiterated by the Wyoming Supreme Court:

> BDED is a Delaware corporation with its principal place of business in Buffalo, Wyoming. [BDE] is a Wyoming corporation. Both are oil and gas exploration companies. Despite the similarities in their names, they claim they are separately owned and managed. The problems in this case allegedly arose when the Commission and WOSLI treated them as the same entity.

*See Black Diamond Energy of Del., Inc. v. Wyo. Oil & Gas Conservation Comm'n*, 2020 WY45, ¶ 3, 460 P.3d 740, 743 (Wyo. 2020). If this Court were to adopt Plaintiff's position in this case— that BDE and BDED underwent a de facto consolidation and were, for all intents and purposes, the same company—it would create the impression that either this Court or the Wyoming Supreme Court was misled as to the actual relationship between BDE and BDED. Lastly, Plaintiff would be unfairly advantaged without application of the doctrine.

Notably, however, the three factors appear to address only those situations where the same party asserts the inconsistent positions. BDED asserted it was markedly different from BDE before the Wyoming Supreme Court, whereas Peter D. Holdings, not BDED, is the party asserting the two companies are the same. Under the circumstances of this case, this difference will not serve as a bar to applying the doctrine.

In some circumstances, it may be inappropriate to bind a party in the present action to a non-party's prior inconsistent positions. *See Wilkins v. DeReyes*, 687 F.2d 1381, 2009 WL 10707063, at *7 (D. N.M. Aug. 11, 2009) (table) (declining to invoke the doctrine because of third-party's prior inconsistent position). But where the parties at issue are so inextricably intertwined, as is the case here, equity may demand application of the doctrine, nevertheless. Indeed, there is "no precise formula" for how and when courts should utilize the doctrine of judicial estoppel. *New Hampshire*, 532 U.S. at 750–51; *Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008).

While still cognizant of the Tenth Circuit's guidance to apply the doctrine narrowly and cautiously, this Court holds that equity demands Plaintiff be estopped from asserting the factual argument that is so clearly inconsistent with BDED's prior assertions made before the Wyoming Supreme Court. The cases and the parties are so intertwined that it is fair and reasonable to bind Peter D. Holdings to BDED's prior statement.[26] Both cases are an attempt to recoup money that was lost during BDED's attempt to develop CBM wells in the Powder River Basin. Peter D.

---

[26] Plaintiff argues the doctrine should not apply because BDED's Wyoming Supreme Court briefing was filed in August 2019, before the trial in this case took place. According to Plaintiff, Defendants should have known about this inconsistent assertion and brought it to the Court's attention much earlier than in post-trial briefing. The Court disagrees. The three factors for consideration provide that, for proper and narrow application, a previous court must accept the inconsistent factual allegation. *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). The mere filing of BDED's brief was insufficient for Defendants to properly move for application of the doctrine and satisfy its burden as to this issue. *Asarco, LLC*, 844 F.3d at 1207 (stating the party moving for application bears the burden of establishing its appropriateness and necessity). It was not until the Wyoming Supreme Court issued its opinion in April 2020 that Defendants could sufficiently satisfy its burden, and therefore Defendants' supplemental motion was timely and proper.

Holdings designated Koval, BDED's President, to serve as its party-representative at trial. Lastly, this is not the first time Plaintiff in this case has proffered inconsistent assertions, which makes application of the doctrine even more equitable.[27]

Despite finding that Plaintiff is not the real-party-in-interest for most of its causes of action, the Court continues to consider the merits of each claim in the interest of producing a complete record.

### BREACH OF CONTRACT: THE FARMOUT AGREEMENT

Plaintiff's breach of contract claim is considered under Wyoming law. *See Morrow v. Xanterra Parks & Resorts*, 925 F. Supp.2d 1231, 1232 (D. Wyo. 2013). In Wyoming, a breach of contract claim consists of the following elements: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement to damages. *Halling v. Yovanovich*, 391 P.3d 611, 616 (Wyo. 2017).

The Court finds, and the parties do not dispute, that the Farmout Agreement is a lawfully enforceable contract. The issue is whether Wold unjustifiably failed to perform under the Farmout Agreement.

#### *Purchased Assignment:*

With respect to the Purchased Assignment, Wold agreed to convey 25% of its interest in the Contract Area. Wold timely complied with this promise. This portion of Plaintiff's breach of contract claim is based on its allegation that Wold improperly limited the conveyance by depth because BDE intended to purchase, and Wold agreed to convey, an undivided interest

---

[27] When BDED filed suit against WOGCC in October 2017, it stated that BDED maintained its principal place of business in Buffalo, Wyoming. [ECF No. 14, at 4]. When Peter D. Holdings filed suit in this Court in December 2017, and attempted to include BDED as a party, and alleged that BDED had its principal place of business in Western Pennsylvania. [ECF No. 1; ECF No. 14, at 3].

in the Contract Area. [Vol. II, at 425–26 (Koval)]. According to Koval, the depth limitation applied only to the earnable assignments. [*Id.*].

The executed Assignment clearly and unambiguously conveys a working interest that is limited "from the surface of the earth down to the base of the Fort Union Formation." This limitation is underlined on page 1 of the assignment and expressed in bold and all caps on page 3. [Pl.'s Ex. 3, at 1, 3]. In accordance with this depth limitation, the Farmout Agreement defined "Contract Depth" as "that depth sufficient to test the coals of the Fort Union Formation for the presence and production of coal bed methane gas in commercially producible quantities." [Pl.'s Ex. 2, at 6; *See* Vol. III, at 510–11 (describing how the shallow portion of the Taylor Units were carved out and renamed the Black Diamond Run by BDE)].

Both the Farmout and the Assignment clearly and unambiguously demonstrate the parties' intention to limit the assignment by depth. Enforcing the clear and unambiguous terms with respect to the Purchased Assignment, *Claman*, 2012 WY 92, at ¶ 26, 279 P.3d at 1013, the Court finds Wold complied with its obligations and therefore Plaintiff's breach of contract claim must fail.

Plaintiff's claim that Wold failed to assign the Woods Research and Development portion of the Contract Area must also fail. First, the Court found that the interest was properly conveyed to BDE. [Vol. IV, at 724–25]. Second, even if Wold had failed in this regard, the claim would be barred by the ten-year statute of limitations because BDE clearly knew of this issue as early as November 2003. [*See* Pl.'s Ex. 4]. Therefore, the statute expired in November 2013.

*Earnable Assignments:*

BDE's breach of contract claim with respect to the Earnable Assignments must also fail. Wold did not breach the Farmout Agreement by failing to convey any additional interests because BDE failed to earn them.

Indeed, Plaintiff fails to argue it fully and completely complied with its contractual obligations. Instead, Plaintiff argues it substantially complied with its obligations, and its substantial performance entitled it to Wold's additional interests.

The doctrine of substantial performance allows a party that has substantially complied with a contract to recover for its performance despite the fact that it breached the contract by failing to comply fully with its terms. *Larson v. Burton Const., Inc.*, 421 P.3d 538, 546–47 (Wyo. 2018). The doctrine is rooted in fairness, and is intended to protect a party's right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies. *Id.* at 547. A party may not recover on a theory of substantial performance if the defects in performance are so serious as to deprive a party of its value for intended use, or if deduction of damages will not be fair compensation. *Lusk Lumber Co. v. Indep. Prods. Consol.*, 249 P. 790, 793 (Wyo. 1926).

Plaintiff's substantial performance argument is derived from BDE's purported "completion" of the Initial Wells mere weeks after the deadline, and its "completion" of the one Additional Well just days after the deadline.[28] As noted above, the completion dates

---

[28] If the Court were to adopt Plaintiff's theory that it substantially performed under the Farmout by completing the Initial Wells in January 2004 and the Additional Wells in May 2004, Plaintiff's claim for breach of contract would be barred by the ten-year statute of limitations. *See* WYO. STAT. ANN. § 1-3-105(a)(i); *Richardson Assocs. v. Lincoln-Devore, Inc.*, 806 P.2d 790 (Wyo. 1991).

indicated on the WOGCC well reports indicate only that BDE drilled wells that were capable of producing gas; BDE never commenced dewatering operations on the wells. Dewatering the wells—a prerequisite to producing gas—went to the very essence of the contract. [Pl.'s Ex. 2, at 6]. And while BDE failed to timely dewater the wells, surrounding wells began producing gas and draining Wold's leasehold. [Pl.'s Ex. 13, at 2]. This failure is not so technical, minor, inadvertent, or unimportant such that the doctrine of substantial performance can entitle BDE to compensation. *See Larson*, 421 P.3d at 547.

Plaintiff appears to suggest that the dewatering requirement was a "unique" inclusion compared to the industry's general definition of "drill and complete." [ECF No. 105, at 4 ("So now we learn that none of the wells was 'complete' under the Farmout Agreement's (somewhat unique definition) of completion that includes 'commencement of dewatering operations.'"]. However unique the definition may be, Wold and BDE reduced the definition to writing, and as such they are bound by its terms. *Collins v. Finnell*, 29 P.3d 93, 98 (Wyo. 2001) (parties are free to ignore the provisions of an applicable and enforceable contract, but they do so at their peril).

BDE failed to earn an additional 25% of Wold's interest surrounding the Initial and Additional Wells, substantially or otherwise. Accordingly, Wold was under no obligation to convey these interests to BDE, and Plaintiff's breach of contract claim must fail in this respect.

Similarly, Wold did not breach the Farmout Agreement by failing to convey 25% of its interest throughout the Contract Area. First and foremost, BDE's timely completion of the Initial and Additional Wells was a condition precedent to its option to earn an interest in the remaining portion of the Contract Area. In Wyoming, a condition precedent is "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance

41

of a promise arises." *Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.*, 803 P.2d 366, 368 (Wyo. 1990). "As is the case with other provisions of a contract, conditions precedent are to be construed in accordance with the true intent of the parties." *Pac.-Wyo. Oil Co. v. Carter Oil Co.*, 226 P. 193, 197 (Wyo. 1924).

The Farmout Agreement clearly and unambiguously provides that BDE's option to earn 25% of Wold's interest throughout the entire Contract Area was conditioned on its timely completion of the Initial and Additional Wells. [*See* Pl.'s Ex. 2, at 8, ¶ 3.3]. Because BDE failed to timely complete the Initial and Additional Wells, BDE's option and its attendant requirements, such as expending the balance of the Program Deposit, were never triggered. This conclusion finds support in the condition that BDE expend the balance of the Program Deposit within one year of completing the last Additional Well, which never occurred. Moreover, BDE never "hooked up" the Initial or Additional Wells and therefore failed to spend any money as required by the Farmout Agreement. Notably, a party may satisfy the harsh rule of complete and exact performance under a condition precedent by demonstrating it substantially performed with it obligations. *Leitner v. Lonabaugh*, 402 P.2d 713, 719 (Wyo. 1965). But much like BDE's failure to dewater the wells, BDE's failure to "hook up" the wells was so significant that it deprived Wold of its benefit of the bargain such that BDE cannot reasonably be said to have earned any additional conveyance.

Lastly, Plaintiff argues Wold breached the Farmout by failing to enter into a JOA. The Farmout required the parties to "enter into another operating agreement" *once* BDE expended the balance of the Program Deposit and effectively earned 50% of Wold's interest throughout the Contract Area. [Pl.'s Ex. 2, at 8]. BDE did not expend the balance of the Program Deposit and did not earn any additional interests throughout the Contract Area. Therefore, Wold was

under no obligation to enter into another operating agreement, according to the Farmout's terms, and Plaintiff's breach of contract claim must fail in this respect.

### *Specific Performance*

Because Plaintiff's breach of contract claim with respect to the Farmout Agreement fails in its entirety, Plaintiff is not entitled to any relief. But even if Wold did breach the Farmout and Plaintiff were entitled to relief, Plaintiff would not be entitled to its requested relief of specific performance.

Specific performance is an equitable remedy that compels the breaching party to do that which it promised to do. *Davidson Land Co., LLC v. Davidson*, 2011 WY 29, ¶ 33, 247 P.3d 67, 76 (Wyo. 2011). Specific performance is not granted as a matter of right, and is instead a consideration entirely within the discretion of the trial court. *Reed v. Wadsworth*, 553 P.2d 1024, 1035 (Wyo. 1976). The remedy may only be considered as an alternative to monetary damages and when the aggrieved party proves that monetary damages are inadequate or impracticable. *Takahashi v. Pepper Tank & Contracting Co.*, 131 P.2d 339, 346 (Wyo. 1942).

Plaintiff has failed to argue, let alone demonstrate, that monetary damages are inadequate or impracticable. Moreover, specific performance may be refused as a proper remedy if its enforcement would cause unreasonable or disproportionate hardship to third persons. *Davis v. Harmony Develop., LLC*, 2020 WY 39, ¶ 30, 460 P.3d 230, 239 (Wyo. 2020). Chipcore was not a party to the Farmout Agreement and it would no doubt suffer disproportionate hardship if it were ordered to convey a portion of its purchased interests six years after the fact.

BDE's failure to make any demands for the assignments it now claims a right to is particularly troubling. It is well-known that oil and gas property is, more than any other

property, uniquely situated and subjected to sudden fluctuations in value. *Moncrief v. Shio Petroleum Co.*, 775 P.2d 1021, 1025 (Wyo. 1989). The unique nature of oil and gas property rightfully binds persons claiming to have an interest in it "to the utmost diligence in enforcing them[.]" *Id.* (discussing the unusual nature of oil and gas properties and how parties seeking equitable remedies must act promptly) (quoting *Patterson v. Hewitt*, 195 U.S. 309, 321 (1904)). If, as Plaintiff argues, the parties had agreed to a conveyance different than the executed and recorded Assignment, it would only seem logical for BDE to demand a correction; and if BDE had timely met its completion requirements, it would only seem prudent to demand a conveyance. But rather than demanding any corrections or additional conveyances, BDE sat idly.[29]

In *Rainbow Oil Company v. Christmann*, the Wyoming Supreme Court affirmed the trial court's award of specific performance under a farmout agreement where the plaintiff-farmee abided by the terms of the contract, made timely demands for the conveyance that were refused by the defendant-farmor, and the plaintiff-farmee diligently brought suit for the specific performance requested. 656 P.2d 538, 545 (Wyo. 1982). In stark contrast, BDE failed to abide by the terms of the Farmout, failed to make *any* demands for any additional or corrected conveyances, and filed suit for specific performance *fourteen years* after the allegedly incomplete assignment was executed and recorded and more than *ten years* after the Farmout Agreement terminated. The particular facts of this case simply do not demand the equitable relief Plaintiff now seeks. Thus, even if Plaintiff were entitled to damages under the

---

[29] Plaintiff argues neither the Farmout nor the Letter Agreements contain such a demand requirement. BDE, BDED's, and Peter D. Holdings's lack of demands are not material because it somehow breached the Agreements. The lack of demands factually lend support to a finding that BDE never satisfied its contractual obligations.

Farmout, the Court would decline to exercise its discretion to invoke the equitable principles underlying the doctrine of specific performance.

### BREACH OF CONTRACT: THE LETTER AGREEMENT

Much like the Farmout Agreement, the parties do not dispute the validity or enforceability of the Letter Agreement. The issue is whether Plaintiff proved the remaining two elements by a preponderance of the evidence: (1) Wold's unjustified failure to timely perform all or any part of what is promised therein and (2) entitlement to damages. *See Halling*, 391 P.3d at 616.

Under the Letter Agreement, BDE was required to absorb financial responsibility for the subject wells until they were completed, electrified, dewatered, and hooked-up to sales. [Pl.'s Ex. 13, at 11]. BDE not only failed to complete, electrify, dewater, and hook-up the wells, it also failed to carry Wold for the costs expended in its attempt to do so. In its December 2008 JIB, BDE billed Wold for the fourteen wells it agreed to carry. By doing so, BDE breached its obligations under the Letter Agreement.

Wold was required to bear its proportionate share of expenses on all New Wells, subject to BDE's compliance with the JOA guidelines and COPAS accounting procedures governing JIBs. Wold timely paid the portions of JIBs that were compliant. To the extent Wold withheld any amounts billed, the Court finds it had a right to do so. In each instance, the amounts were withheld because the JIBs ran afoul of the JOA and COPAS requirements.

The Letter Agreement required Wold to sign an operating agreement upon approval BDE's submission of JIBs. Wold timely satisfied this obligation. Wold signed the Letter Agreement on October 9, 2008. BDE sent its first post-Letter Agreement JIB on October 16,

2008. Wold then signed the JOA—less than one week later—on October 22, 2008. [Defs.' Ex. F, at 26; Defs.' Ex. Q, at 4].

In sum, Plaintiff failed to demonstrate that Wold unjustifiably failed to carry out its obligations under the Letter Agreement. To the contrary, Wold timely satisfied its contractual obligations. BDE, not Wold, is the one in breach. Therefore, Plaintiff's claim for breach of contract and request for monetary damages must fail.[30]

**RESCISSION**

In Wyoming, a claim for rescission may be based on fraudulent inducement by a material misrepresentation or by a material breach. *Racicky v. Simon*, 831 P.2d 241, 243 (Wyo. 1992); *Schepps v. Howe*, 665 P.2d 504, 508 (Wyo. 1983). Plaintiff's claim for rescission appears to be premised on both. Specifically, Plaintiff's argument centers on the allegation that at the time the parties executed the Farmout and Letter Agreements, Wold never intended to comply with its contractual obligations (a material misrepresentation) and Wold's failure to comply with its contractual obligations (a material breach) entitles it to a rescission of both Agreements.

To succeed on a claim for rescission based on a material misrepresentation theory, a plaintiff must establish—by clear and convincing evidence—that the opposing party misrepresented a material fact, the party reasonably relied on those representations in entering into the contract, and the party's reasonable reliance on the misrepresentation resulted in his

---

[30] Both parties offer proposed findings of fact and argument as to the effect the parties' Letter Agreement had on the Farmout Agreement. The Court does not find this fact to be material, but offers findings for purposes of a complete record. In that respect, the Court finds as follows: (1) the Letter Agreement did not modify the terms of the Farmout Agreement; [*See* Pl.'s Ex. 24 (specifically stating the Farmout Agreement had terminated); and  (2) the Letter Agreement became inapplicable when BDE resigned as Operator of Record effective March 1, 2009. [Defs.' Ex. Q, at 4, ¶ 18].

injury. *Id.* Plaintiff has failed to argue, let alone establish, that Wold misrepresented its intentions to comply with the terms of the Agreements. Moreover, the Court finds Wold complied with its obligations, which vitiates an argument that compliance was never Wold's intention. For the same reason, Wold's allegedly material breach is insufficient to establish Plaintiff is entitled to rescission. Therefore, Plaintiff's claim for rescission must fail.

Additionally, Wyoming law requires parties to exercise their right to rescission promptly. *Cady v. Slingerland*, 514 P.2d 1147, 1149 (Wyo. 1973). Whether the right was exercised promptly is considered from when the plaintiff knew or should have known of the material breach or fraudulent misrepresentation. *Fryer v. Campbell*, 43 P.2d 994, 997 (Wyo. 1935). Wold did not breach either Agreement, and therefore BDE, BDED, and Peter D. Holdings never had the right to rescission on that basis. Plaintiff alleges the fraudulent misrepresentations occurred in 2003 and 2008 when the Agreements were executed. BDE and BDED never attempted to exercise their right to rescission; Peter D. Holdings first sought to exercise its right to rescission in December 2017 when it filed this lawsuit. This attempt is the antithesis of prompt. Therefore, Plaintiff's claim for rescission fails as a matter of law.

ACCOUNTING

Plaintiff seeks an accounting as an equitable remedy, not as a contractual remedy arising under the terms of the executed JOA. Whether this equitable remedy is appropriate is a determination afforded to the trial court's discretion. *Y-O Investments, Inc. v. Emke*n, 2006 WY 112, ¶ 9, 142 P.3d 1127, 1130–31 (Wyo. 2006). A trial court abuses its discretion to order an equitable accounting when the remedy lacks legal or evidentiary support. *Id.* at 1131.

Plaintiff's accounting claim is ancillary to its breach of contract claims. [*See* ECF No. 104, at 18–19 (arguing Plaintiff is entitled to an accounting based on Wold's breach of the

Farmout and Letter Agreements)].   Because the Court finds Wold did not breach the Agreements, Plaintiff's request for an accounting lacks both legal and evidentiary support. *See Y-O Investments, Inc.*, 2006 WY 112, at ¶ 17, 142 P.3d at 1133 ("By ruling that [appellant] had not defaulted on the note and mortgage, [appellee's] ancillary accounting claim was without legal basis because an accurate calculation of damages was unnecessary."). Therefore, Plaintiff's claim for an accounting must fail.

UNJUST ENRICHMENT

Plaintiff asserts—for the first time in its post-trial briefing and proposed findings—that it should prevail on a claim for unjust enrichment and the Court should award monetary damages equivalent to the amount BDE expended in the drilling and development of the wells in POD I. [ECF No. 105, at 9–10]. A failure to do so, according to Plaintiff, would result in an inequitable and unjust enrichment to Wold and Chipcore at the expense of BDE, BDED, and Peter D. Holdings. Plaintiff maintains this new theory is timely and proper under Rule 15(b)(2) of the Federal Rules of Civil Procedure.

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings. FED. R. CIV. P. 15. Under Rule 15(b), there are two mechanisms by which a party may amend its pleadings after trial. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004). "First, a complaint may be impliedly amended under Rule 15(b) if an issue has been tried with the express or implied consent of the parties and not over objection." *Id.* Second, the party seeking the amendment may formally file a motion seeking leave to amend the complaint to conform to the evidence presented at trial. *Id.* at 1280–81. In this case, Plaintiff seeks to implicitly amend its Second Amended Complaint under the first mechanism.

An issue is tried with the parties' implied consent when the proponent of the amendment introduced evidence at trial in support of the new issue and without objection from the opposing party. *Id.* at 1280. In this context, implied consent cannot be found where the evidence offered was relevant to an already-existing issue and there was no indication by the proponent that the evidence was offered in support of the new issue. *Id.*; *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1162 (10th Cir. 1999).

The evidence offered in support of Plaintiff's newly-offered unjust enrichment theory is that BDE expended significant amounts of money to drill and develop the Contract Area and that Defendants have failed to pay their proportionate share of those expenses. This evidence goes to the very heart of this lawsuit, and there was no indication at trial that this evidence was offered in support of a new claim for unjust enrichment. This is especially true given Plaintiff's previous claim for unjust enrichment was dismissed with prejudice on summary judgment. [ECF No. 71, at 34]. Therefore, Rule 15(b)(2) does provide an avenue for Plaintiff to amend its Second Amended Complaint to assert its new unjust enrichment claim. *See Green Country Food Mkt., Inc.*, 371 F.3d at 1280.

Despite Plaintiff's untimely assertion of this cause of action, the Court will consider the merits of this argument in the interest of a complete record and a full and complete adjudication of the case. *See Lyons v. Jefferson Bank & Trust*, 793 F.Supp. 989, 993 (D. Colo. 1992) (stating unjust enrichment theory raised for the first time in post-trial briefing was "a blatant attempt to belatedly inject new issues into the case at the district court level" but considering the arguments on its merits in the interest of a complete record), *aff'd on this issue*, 994 F.2d 716, 723 (10th Cir. 1993) (stating trial judge's decision to address new theory reduced the possibility of a time-consuming remand).

Unjust enrichment may serve as a basis for recovery when one party unjustly retains a benefit to the loss of another. *Schlinger v. McGhee*, 2012 WY 7, ¶ 23, 268 P.3d 264, 272 (Wyo. 2012). As an equitable remedy, a party cannot succeed on a claim for unjust enrichment where there is an express contract that governs the parties' relationship. *Id.* at ¶ 25, 268 P.3d at 272. The Letter Agreement expressly provides that BDE would carry Wold for the expenses associated with completing, electrifying, dewatering, and hooking-up the fourteen wells in POD I. [Pl.'s Ex. 13, at 11]. Thus, whatever benefit Wold and Chipcore retained at BDE's expense, it was a benefit BDE expressly and unambiguously agreed to provide.[31] As such, Plaintiff's unjust enrichment claim must fail. *See Schlinger*, 2012 WY 7, at ¶ 23, 268 P.3d at 272.

## CONVERSION

### *Statute of Limitations*

Conversion occurs when a person wrongfully executes dominion over another's property. *Young v. Young*, 709 P.2d 1254 (Wyo. 1985).  A claim for conversion is subject to a four-year statute of limitations. WYO. STAT. ANN. § 1-3-105(a)(iv)(B); *Amoco Prod. Co. v. EM Nominee*, 2 P.3d 534, 543 (Wyo. 2000). "Wyoming is a discovery state in which the statute of limitations is triggered when a plaintiff knows or has reason to know of the existence of a cause of action." *Amoco Prod. Co.*, 2 P.3d at 642.

BDE voluntarily delivered inventory and equipment to the Contract Area on June 30, 2009. As of June 30, 2009, BDE knew or had reason to know that Wold and the other working

---

[31] Plaintiff's claim for unjust enrichment with respect to the inventory and equipment was dismissed for the exact same reason on summary judgment. [ECF No. 71, at 34]. Given the procedural posture in this case, Plaintiff's argument is disingenuous at best.

interest owners would use the inventory and equipment to develop the Contract Area. Accordingly, the statute of limitations for a claim of conversion expired on July 1, 2013. Plaintiff failed to bring a claim for conversion within the statute of limitations, and therefore this claim is barred.

For the sake of making a complete record, the Court will continue to address the merits of Plaintiff's claim.

### *The Merits*

There are five elements to a conversion cause of action: (1) the plaintiff had legal title to the converted property; (2) the plaintiff either had possession of the property or the right to possess it at the time of conversion; (3) the defendant exercised dominion over the property in a way that denied the plaintiff his rights to use or enjoy the property; (4) if defendant lawfully had possession of the property, or obtained possession of the property without fault, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff suffered some damage by the loss of property. *Frost v. Eggeman*, 638 P.2d 141, 144 (Wyo. 1981). Plaintiff must establish these elements by a preponderance of the evidence. *See Parkhurst v. Boykin*, 2004 WY 90, ¶ 3, 94 P.3d 450, 453 (Wyo. 2004).

BDE—not Peter D. Holdings—holds title to the inventory and equipment in question. Plaintiff failed to explain *when* the inventory and equipment was converted, but simply using the applicable statute of limitations as a frame of reference, it is evident that Peter D. Holdings did not have legal title to the property or a right to possess the property between 2009 and 2013. Indeed, the earliest Peter D. Holdings could have had an interest in the property and equipment was in March 2014 after it obtained the S&T Loan obligations. Indeed, up until October 28, 2013, BDE was attempting to enforce the settlement agreement reached in the

Pennsylvania state court action whereby it would convey the inventory and equipment to Mitchell Resources. [Defs.' Exs. I, J, L, M].

Plaintiff also failed to establish Wold wrongfully exercised dominion over the property. It is common industry practice that a resigning Operator of Record will deliver inventory and equipment to the successor-Operator, which it did. BDE voluntarily delivered the equipment to the Contract Area, which comports with this industry practice. As successor-Operator, Wold then used the equipment and inventory to develop the Contract Area. Based on the evidence in the record, this use was not wrongful.

Most importantly, Plaintiff failed to demonstrate the requisite demand: "In all cases where a defendant is rightfully in possession, both a demand for possession and an absolute refusal to deliver the property are necessary before a suit will lie for conversion." *Champion Ventures, Inc.*, 567 P.2d at 727. The earliest Peter D. Holdings could be said to have made a proper demand for the equipment was in April 2014, which logically occurred only *after* Peter D. Holdings obtained the S&T Loans from Mitchell Resources. Even then, this April 2014 correspondence is not a demand and "absolute refusal." *See id.* The first proper demand and refusal for a return of or compensation for the equipment was made in 2015 when Peter D. Holdings and BDED filed the Wyoming state court action.

As to element five, Plaintiff offered into evidence a spreadsheet detailing the value of the inventory and equipment to be $575,004.20. This does not demonstrate a resulting injury. BDE voluntarily took the equipment to the Contract Area for the Operator of Record to use; Wold and Chipcore—as successor operators—did just that. The equipment and inventory was used to develop the wells in POD I which includes wells that Peter D. Holdings has an interest

in. If anything, Defendants' use of the equipment assisted in the production of gross revenue attributable to Peter D. Holdings as indicated in the 1099s.

In summary, Plaintiff's conversion claim must fail for several reasons. Plaintiff is not the real-party-in-interest to the cause of action, it failed to establish Defendants' liability for conversion by a preponderance of the evidence, and the claim is barred by the applicable statute of limitations.

## CONCLUSION

Courts are not at liberty to rescue parties from the consequences of a bad bargain by rewriting a contract under the guise of interpreting it. *In re CDR*, 2015 WY 79, ¶ 30, 351 P.3d 264, 271 (Wyo. 2015). That is precisely what Plaintiff asks the Court to do. For this reason, Defendants must prevail as to all claims.

IT IS SO ORDERED.

DATED this 12th day of August, 2020.

Kelly H. Rankin
United States Magistrate Judge